# EXHIBIT 2

# ADMINISTRATIVE SERVICES CONTRACT (ASC) - MONTHLY WIRE PROGRAM

between

## BLUE CROSS AND BLUE SHIELD OF MICHIGAN

and

## CHALLENGE MFG. COMPANY

THIS CONTRACT, effective as of **January 1, 2005**, is between BLUE CROSS AND BLUE SHIELD OF MICHIGAN (BCBSM), a Michigan non-profit Corporation, whose address is 600 Lafayette East, Detroit, Michigan 48226, and **Challenge Mfg. Company** (Group) the plan sponsor and administrator of the **Challenge Mfg. Company** Employee Benefits Plan (GHP), whose address is 3079 Three Mile Road NW, P.O. Box 141637, Walker, Michigan 49514. The term "Group" includes the "GHP" where the context reasonably requires a reference to both.

The intent of this Contract is to establish the criteria for eligibility of individuals for health care Coverage provided by the Group; to describe health care Coverage available to such individuals through the Group; to set forth the general responsibilities of BCBSM and the Group; and to set forth the financial responsibilities of the Group for health care Coverage administered by BCBSM under this Contract.

THEREFORE, in consideration of their mutual promises, BCBSM and the Group agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Contract, defined terms are:

A. **"Amounts Billed"** means the amount the Group owes in accordance with BCBSM's standard operating procedures for payment of Enrollees' claims.

B. **"Contract"** means this Contract, as may be amended from time to time, and any Schedules, Exhibits and Addenda attached hereto.

C. **"Contract Year"** means the Initial Term of this Contract and each Renewal Term. In the event of termination other than at completion of the Contract Year, a Contract Year means that period from the Effective Date or the most recent Renewal Date through the termination date.

D. **"Coverage(s)"** means the health care benefits selected by the Group on Schedule C - Coverage(s).

E. **Disputed Claim(s)"** means Amounts Billed used to determine the Group's liability which the Group believes should not be so used.

F. **"Effective Date"** means (Insert Date) January 1, 2005

**G.** **"Employees"** means the following who are eligible and enrolled for Coverage: (i) employees as designated by the Group in Schedule B, Group Enrollment Profile; (ii) if applicable, retirees and their surviving spouses as designated by the Group in the Retiree Agreement; and (iii) COBRA beneficiaries.

**H.** **"Enrollees"** mean Employees and dependents of Employees who are eligible and enrolled for Coverage.

**I.** **"Estimated Outstanding Liability (EOL)"** means an estimate of the Group's liability for the amount of Incurred But Not Reported Claims (IBNR) which will be paid by BCBSM after the date of termination, and which is the Group's obligation to pay pursuant to the provisions of this Contract.

**J.** **"IBNR Claims"** means Enrollees' claims which are incurred pursuant to this Contract but have not been reported as paid to the Group and for which Amounts Billed will remain the Group's responsibility pursuant to this Contract.

**K.** **"Initial Term"** means the first Contract Year commencing on the Effective Date.

**L.** **"Provider Network Fee"** means the amount allocated to the Group for the expenses incurred by BCBSM in the establishment, management and maintenance of its participating hospital, physician and other health care provider networks.

**M.** **"Quarterly Payment Period"** means each three (3) month period, commencing on the Effective Date and continuing during the Term(s) of this Contract and, for purposes of Article IV.F. only, also includes the first three (3) months following termination.

**N.** **"Renewal Date"** means the first day of each Renewal Term stated in Schedule A.

**O.** **"Renewal Term"** means a period commencing on the first day following the end of the Initial Term and of each subsequent Contract Year as stated in Schedule A.

**P.** **"Term(s) of this Contract"** means the period(s) beginning with the Effective Date and continuing thereafter until terminated as provided in Article VII.

## ARTICLE II
## GENERAL RESPONSIBILITIES

**A.** **Standards.**

BCBSM shall administer Enrollees' health care Coverage(s) in accordance with BCBSM's standard operating procedures for comparable coverage(s) offered under a BCBSM underwritten program, any operating manual provided to the Group, and this Contract. In the event of any conflict between this Contract and such standard operating procedures, this Contract controls.

The responsibilities of BCBSM pursuant to this Contract are limited to providing administrative services for the processing and payment of claims. BCBSM shall have no responsibility for: the failure of the Group to meet its financial obligations; to advise Enrollees of the benefits provided; and to advise Enrollees that Coverage has been terminated for any reason, including the failure to make any payments when due.

If the Group's health care program is subject to the Employee Retirement Income Security Act of 1974 as amended (ERISA), it is understood and agreed that BCBSM is neither the Plan Administrator, nor the Plan Sponsor of the GHP. To the extent that the Group has delegated the responsibility and discretionary authority to provide a full and fair review of Enrollee claims (as required under ERISA §503) to BCBSM, BCBSM agrees (i) only to assume such responsibility and authority, including any responsibility it may have as a "named fiduciary" (as defined under ERISA §402) for purposes of claim review, only to the extent that under the GHP and ERISA it meets the definition of a "named fiduciary" and (ii) to comply with applicable regulations of the Department of Labor when exercising such responsibility and authority. Any determination or interpretation made by BCBSM pursuant to this discretionary authority is binding on the Enrollee, the Group, and BCBSM unless it is demonstrated that the determination was arbitrary and capricious. The Group retains all other responsibilities and duties under ERISA not specifically delegated to BCBSM. The provisions of this paragraph, however, shall not release BCBSM from any other responsibilities it may have under ERISA.

**B.** **Enrollment.**

The Group will, prior to the Effective Date of this Contract, notify BCBSM of all Enrollees eligible and enrolled for Coverage and will, thereafter, promptly notify BCBSM of all changes in eligibility/enrollment according to procedures established by BCBSM. BCBSM will not have any obligation as to changes in eligibility/enrollment prior to proper notification. BCBSM will continue to process and the Group will continue to reimburse BCBSM for claims of Enrollees which were incurred through the last day of the month in which BCBSM had at least five (5) business days notice of Enrollee ineligibility.

However, if Group employs an automated means, acceptable to BCBSM, for providing enrollment and eligibility information to BCBSM, the changes will be effective on the first day following the day such changes have been properly reflected on the data base used by BCBSM to process Enrollees' claims.

**C.** **Claims.**

BCBSM will process and pay, and the Group will reimburse BCBSM for all Amounts Billed related to Enrollees' claims incurred during the Term(s) of this Contract.

Following termination of Enrollee eligibility, or following termination of this Contract, as set forth in Article VII.B.1., BCBSM will continue to process and pay Enrollees' claims which are incurred during the Term(s) of this Contract; and following termination for Nonpayment or Partial Payment, as set forth in Article VII.B.2., or in the event of Enrollee ineligibility, BCBSM may, in its discretion, continue to process and appropriately pay IBNR claims and the Group will reimburse BCBSM for any claims so paid.

Notwithstanding any other Contract provisions, BCBSM will have no obligation whatsoever as to claims which are incurred following termination of this Contract.

**D.** **Dispute Resolution.**

The Group will, within sixty (60) days of receipt of a claims listing, notify BCBSM in writing with appropriate documentation of any Disputed Claim(s) and will, upon request, execute any documents required for collection of amounts that third parties owe. The failure of the Group to dispute matters not discernible from the claims listing will not preclude the Group from raising those issues after the sixty (60) day period referred to

in the preceding sentence. BCBSM will investigate and within a reasonable time, respond to such Claim(s). Additionally, BCBSM will,

1. following the recovery of an amount from a third party, due to Worker's Compensation or other provider/program/party responsibility or

2. following BCBSM's determination that any other disputed amount is not the Group's liability or that an amount shown on a claims listing and invoice is incorrect,

credit the recovered or corrected amount, reduced by any Stop Loss payments relating to such Claim(s) or any amounts currently overdue, on a subsequent monthly invoice.

BCBSM, as administrator under this Contract, is subrogated to all rights of the Group/Enrollees relating to Disputed Claim(s) but is not obligated to institute or become involved in any litigation concerning such Claim(s).

**E.    Group Audits.**

The Group, at its own expense, shall have the right to audit Enrollee claims incurred under this Contract; however, audits will not occur more frequently than once every twelve (12) months and will not include claims from previously audited periods or claims paid prior to the last twenty-four (24) months. Both parties acknowledge that claims with incurred dates over two (2) years old may be more costly to retrieve and that it may not be possible to recover over-payments for these claims; however, BCBSM will use best efforts to retrieve such claims.

All audits will be conducted pursuant to BCBSM corporate policy and other requirements at the time of the audit. The parties acknowledge staffing constraints may exist in servicing concurrent group-initiated audits. Therefore after notice from the Group requesting an audit, BCBSM will have until the later of (i) 30 days after the Audit Agreement (as defined below) is signed or (ii) the date BCBSM and the auditor agree on the defined data elements, depending on scope and sample size, to begin gathering requested documentation and to schedule the on-site phase of the audit.

Sample sizes will not exceed 200 claims and will be selected to meet standard statistical requirements (i.e., 95% Confidence Level; precision of +/- 3%). The Group will reimburse BCBSM for claims documentation in excess of 200 claims at $20 per randomly selected claim and $50 per focused or electronically selected claim. However, reimbursement will be waived for any agreed-upon error claims.

Following the on-site activity and prior to disclosing the audit findings to the Group, the auditor will meet with BCBSM Management and present the audit findings. BCBSM, depending upon the scope of the audit, will be given a reasonable period of time to respond to the findings and provide additional documentation to the auditor before the auditor discloses the audit findings to the Group.

BCBSM shall have no obligation to make any payments to the Group unless there has been a recovery from the provider, Enrollee, or third-party carrier as applicable. No adjustments or refunds shall be made on the basis of the auditor's statistical projections of sampled dollar errors. An audit error will not be assessed if the claim payment is

consistent with BCBSM policies and procedures, or consistent with specific provisions contained in this Contract or other written Group instructions agreed to by BCBSM.

Prior to any audit, the Group and BCBSM must mutually agree upon any independent third party auditor that the Group wishes to perform the audit. The parties agree that the following firms are acceptable to act as the Auditor: Claims Recovery Services, William M. Mercer Incorporated, or BMI Audit Services, LLC. If, at the time of the audit, none of the previously listed firms are acceptable to both the Group and BCBSM, the Group will submit to BCBSM the names of three independent, third-party auditors acceptable to it from which BCBSM shall choose one to act as Auditor. Additionally, prior to audit, the Group and any third party auditor will sign all documents BCBSM believes necessary for the audit which will, at a minimum, provide for: the scope of the audit; the costs for which BCBSM is to be reimbursed by the Group; the protection of confidential and proprietary information belonging to BCBSM and of any patient specific information; and the indemnification and hold harmless of BCBSM from any claims, actions, demands or loss, including all expenses and reasonable attorney fees, arising from any suit or other action brought by an individual or provider arising out of any breach by the Group and/or its auditor ("Audit Agreement").

**F.** **Disclosure.**

The Group will disclose to Employees: the services being provided by BCBSM; the fact that BCBSM does not insure the Coverage provided to Enrollees; if BCBSM certificates are used for the purpose of selecting the Coverage(s) to be provided by the Group, the fact that Enrollees are not covered under these BCBSM certificates and that BCBSM assumes no liability for the Coverage(s) so selected; the party liable for benefits; the party liable for future changes in benefits; the fact that information concerning Enrollees may be reviewed by parties other than BCBSM; and any other matters mandated by law. Also, the Group will, prior to issuance to Enrollees, submit such disclosure materials as well as all Enrollee materials regarding health Coverage to BCBSM.

**G.** **Statutory and Contractual Interest.**

BCBSM's enabling legislation and participating provider contracts may require payment of interest to Enrollees and providers. Any interest required to be paid to Enrollees will be made in addition to and at the time of late payment of a satisfactory claim and to providers pursuant to contract.

The Group shall reimburse BCBSM for any interest paid if BCBSM did not pay the claim(s) due to: BCBSM's exercise of its contractual right to cease processing claims; the failure of the Group to timely notify BCBSM of Enrollees' eligibility; or specific instructions from the Group not to pay claims. BCBSM shall pay any interest otherwise incurred.

**H.** **Confidentiality.**

The Group may have access to proprietary information of BCBSM; however, in obtaining such access, the Group agrees that it will hold all such proprietary information confidential and shall use such information only for purposes related to Enrollees' claims administered by BCBSM pursuant to this Contract and, further agrees, that no such proprietary information shall be released to any third party without such party having first executed an indemnification and confidentiality agreement in a form acceptable to

5

BCBSM. In releasing any proprietary information, BCBSM does not waive any protection it may have regarding trade secrets and other proprietary information pursuant to either the State or Federal Freedom of Information Acts (FOIA).

I. **Medicare Secondary Payer.**

The Group will be responsible for determining whether any person should be covered under this Contract or under the Medicare Program and to identify to BCBSM all persons subject to the Medicare Secondary Payer statute and regulations so that BCBSM may properly pay any Enrollee claim as primary or secondary under the Medicare Program. The Group agrees to indemnify and hold harmless BCBSM for any claims, demands, judgments, penalties or other liabilities arising out of the Group's failure to provide timely and accurate information in order for BCBSM to make any such determination.

J. **Certification of Creditable Coverage.**

Group____, or BCBSM____, by its initials, agrees to assume all responsibility for issuing automatic certificates of creditable coverage to terminated participants and dependents as required by the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations (HIPAA), and further agrees to respond to any requests for such certificates and related inquiries. The Group will be responsible for notifying BCBSM of all terminations of coverage as set forth in Article II.B. Also, if applicable, the Group will retain responsibility for issuing certificates of coverage to persons entitled to elect COBRA no later than when the Group provides the COBRA notice.

## ARTICLE III
## FINANCIAL RESPONSIBILITIES

A. **General Obligations.**

The Group will immediately assume: all risks; all financial obligations, including but not limited to Amounts Billed, court costs, and attorney's fees; and all other liabilities BCBSM may assume or which might otherwise attach with respect to processing Coverage pursuant to this Contract. The Group will make full payment and satisfaction to BCBSM for all amounts resulting from such risks, financial obligations, and liabilities. Group responsibility will not, however, include amounts resulting directly from any negligent processing/payment of claims by BCBSM.

B. **Specific Obligations.**

The Group will, for each Contract Year, pay BCBSM the total of the following amounts:

1. Amounts Billed during the current Contract Year.

2. The hospital prepayment reflecting the amount BCBSM determines is necessary for its funding of the prospective hospital reimbursement.

3. The actual administrative charge.

4. The group conversion fee.

5. Any late payment charge.

6. Any statutory and/or contractual interest.

7. Stop Loss premiums, if applicable.

8. Cost containment program fee, if applicable.

9. Any other amounts which are the Group's responsibility pursuant to this Contract, including but not limited to risks, obligations or liabilities, deficit amounts relating to previous agreements, and deficit amounts relating to settlements.

The Provider Network Fee, contingency, and any cost transfer subsidies or surcharges ordered by the State Insurance Commissioner as authorized pursuant to 1980 P.A. 350 will be reflected in the hospital claims cost contained in Amounts Billed.

## ARTICLE IV
## PAYMENT OF FINANCIAL RESPONSIBILITIES

**A.   Timely Payment and Remedies.**

All amounts owed pursuant to this Contract will be paid timely. All amounts shown on the Schedule A will be paid by the Group by the monthly payment day/date. Any separately invoiced amounts will be paid within fifteen (15) days of invoice or settlement receipt. BCBSM will pay any amounts due within fifteen (15) days of the settlement.

BCBSM will promptly notify the Group of any overdue payments. Late payment fees will be assessed as follows:

- If any amount is more than one (1) business day overdue, BCBSM will assess a two (2%) percent late payment fee.

- If any overdue amount remains outstanding into the next month, an additional late payment fee will be assessed for such month and each succeeding month for which such amount remains outstanding.

BCBSM will review the Group's payments to determine if any late payments are to be assessed. Payments received will first be applied to any amounts overdue. BCBSM may cease processing and paying Enrollees' claims if any payment is ten (10) days overdue retroactive to the last date for which full payment was made.

The payment day, the payment dates and estimated amounts owed for the first Quarterly Payment Period, the statutory and contractual interest rate, and the late payment charge are stated in Schedule A. However, notwithstanding the late payment charge stated, such charge will not exceed the maximum permitted by law.

**B.   Scheduled Payments.**

1. Schedule A - Initial Term. The scheduled payments to be paid by the Group during the Initial Term (first Contract Year) are listed in Schedule A, which shows the following:

    (1) administrative fee per Employee,

    (2) Stop-Loss premiums per Employee, if applicable,

    (3) estimated number of Employees,

    (4) covered lines of business, including those with Stop Loss if applicable,

    (5) the hospital prepayment necessary to maintain the prospective hospital reimbursement funding,

    (6) estimated monthly payments, including Stop Loss premiums if applicable, and

    (7) the schedule and method of payment.

2. Schedule A - Renewal Term. Annually, approximately thirty (30) days before the end of each Contract Year, BCBSM will present the Group with a revised Schedule A listing items (1) through (4) for the next Contract Year. The remaining items are adjusted as necessary in the quarterly settlements.

3. Estimated Monthly Payments. During the first two Quarterly Payment Periods, the Group will, as stated in Schedule A - Initial Term, monthly pay:

    (1) the pro rata cost of estimated Amounts Billed for the Quarterly Payment Period;

    (2) the estimated administrative charge and, if applicable, of Stop Loss premiums for the Contract Year;

    (3) the amount BCBSM determines necessary to maintain the prospective hospital reimbursement funding for the Quarterly Payment Period; and

    (4) any other amounts owed by the Group pursuant to this Contract.

    Thereafter, BCBSM will, approximately thirty (30) days before each Quarterly Payment Period, notify the Group of any adjustments in the above amounts to be paid during the next Period. The estimated amounts owed relating to claims for each Quarterly Payment Period are based on the total of Amounts Billed during the prior available twelve (12) months, adjusted for costs and utilization.

4. Claims Listings. The Amounts Billed for each month are shown on monthly claims listings provided on approximately the twentieth (20th) of each month by line of business as follows:

    (1) Facility claims listings showing charges by claim and in total, and the total Amounts Billed.

(2) Claims listings for each other line of business showing Amounts Billed by claim and in total.

Each listing will also show any credits for Disputed Claim(s) which have been resolved and any other adjustments.

**C.  Scheduled Settlements.**

1. Quarterly. In conjunction with the payment development for the next Quarterly Payment Period, BCBSM will, approximately sixty (60) days after the close of each Quarterly Payment Period, provide a detailed settlement showing Amounts Billed to and owed by the Group during the prior available Quarter including any surplus or deficit amounts.

2. Annual. For each Contract Year, BCBSM will provide an annual settlement of the estimated and actual administrative charges based on the actual number of Employees. Any deficit or surplus resulting from this settlement will be reflected in the quarterly settlement for the Quarterly Payment Period during which the annual settlement was completed. Stop Loss premiums, if applicable, will be settled in the same manner.

**D.  Changes in Enrollment or Coverages.**

In the event of a more than ten (10%) percent change in Enrollment and/or a change in Coverages, the monthly administrative fee, estimated number of employees and, if applicable, Stop Loss premiums may be revised to reflect such changes in Enrollment and/or Coverages. Any revisions will be effective beginning with the next Quarterly Payment Period following thirty (30) day notification by BCBSM to the Group.

**E.  Hospital Settlement Adjustments.**

Reconciliations of the original and settled hospital reimbursements are made periodically by BCBSM for its participating hospitals. Any hospital settlement adjustments for the Group will be based upon reconciliations made for those hospitals in which services were received by Enrollees and reflected in Amounts Billed. Depending on whether these reconciliations result in a savings or deficit, BCBSM may make either a credit or charge to a special hospital savings account maintained for the Group. If for a given calendar year, any cumulative credits and charges made to this account reflect a positive balance, one half of such cumulative balance, net of any applicable Aggregate Stop Loss settlement payments and/or any other amounts owed BCBSM, plus interest at the then rate for short term government treasury bonds (STIGB), which is currently calculated as a rolling twelve-month average of the 90-day T-Bill yield rate, will be refunded to the Group. It is understood that BCBSM has the right to change the STIGB calculation methodology provided that such change is applied uniformly and consistently to similar Administrative Services Contracts of other BCBSM clients. Only the positive cumulative balance of this special account, if any, will be reflected in any calculations of the Estimated Outstanding Liability (EOL) or in the final settlement for the last Contract Year under Article IV.F. below.

In the event the cumulative balance to this account reflects a negative balance, such balance will not be considered as an amount owed by the Group; however, any negative balance will be charged STIGB and netted against any positive facility settlements. Also,

if this Contract is terminated and as part of the settlement for the last Contract Year under Article IV.F.3., any provider refunds or settlements due the Group will be charged first against any such negative balance. Any excess of such refunds or settlements will be credited to the Group.

**F.** **Post Termination.**

Notwithstanding anything contained herein to the contrary, the Group's obligation to pay amounts incurred under this Contract will survive termination, and the Group will continue to timely pay all amounts owed. Because of the special arrangements and agreements for payment of services between BCBSM and its participating health care providers, all Enrollee claims incurred under this Contract will be processed by BCBSM pursuant to the terms and conditions herein and the Group agrees that it will have no right to have any such claims processed by a replacement carrier or administrator.

1. Monthly Wire Payments. For the first three (3) months following termination the Group will continue to make monthly wire payments in the same manner as, and as determined before termination; however, if the termination occurs before a settlement has been made for the last Quarterly Payment Period, the monthly amounts then being made will continue to be made during the first three (3) months following termination unless BCBSM determines a different amount is to be so paid.

    In addition, the Group will, for each such first two (2) months only, continue to pay the administrative fee in the same manner as determined prior to termination.

2. Estimated Outstanding Liability. Within ninety (90) days following termination, BCBSM will prepare a settlement in the form of a quarterly settlement, for the period from the last quarterly settlement through the date of termination, and make an initial calculation of the Estimated Outstanding Liability (EOL), which will take into account the monthly payments during the first three (3) months following termination and advise the Group of its continuing liability for the EOL so estimated.

    If the total amount of the monthly payments made during the first three (3) month period following termination exceeds the Amounts Billed during the period, BCBSM will pay the Group STIGB on the average monthly balance of any excess. The total amount of any excess will be included as gains in the settlement for the last contract year as provided in Subsection F. 3. below.

3. Settlement - Last Contract Year. Within ninety (90) days after the first three (3) month period following termination, BCBSM will prepare a total settlement for the last Contract Year and such three (3) month period which will include: if applicable, a final settlement for Stop Loss Premium(s) and Aggregate Stop Loss Attachment Point; a final settlement of administrative fees, except that the settlement for the first two (2) months following termination will be based on the average monthly number of Employees during the last Contract Year; the amount of any gain and losses for Amounts Billed during the first three (3) months following termination; the hospital prepayment; the positive balance in the hospital savings account, if any, and other credits due the Group, net of any amounts owed by the Group; and the amount of any STIGB credited to the Group. If the summation of the above shows a loss for the Group, the Group

shall pay that amount within thirty (30) days net of, if applicable, any surplus as recalculated below and, if not so paid, shall be subject to late payment charges.

The EOL will also be recalculated at this time, which will take into account gains, if any, resulting from the total settlement as determined above. If the recalculation shows a deficit over any funds then held by BCBSM, the Group will be advised of the amount of the deficit and of its continuing obligation for payment of the EOL. If the recalculation shows a surplus over any funds then held by BCBSM, the amount of the surplus will be refunded to the Group by BCBSM within thirty (30) days net of, if applicable, any losses resulting from the total settlement as determined above.

BCBSM will first charge any Amounts Billed against any funds then held by it and, after exhausted, will monthly invoice the Group for Amounts Billed. All monthly invoices will be paid within thirty (30) days of invoice or be subject to late payment charges. BCBSM will continue to pay the Group STIGB on any positive balance as set forth in Subsection F. 2. above.

4. <u>Interim Calculations and Notifications of EOL.</u> Within sixty (60) days after each of the six (6) month, twelve (12) month and eighteen month periods following termination, BCBSM will prepare settlements for each period, also in the form of quarterly settlements, and make new calculations of the EOL. The purpose of these interim EOL calculations is so that the Group will be aware of any potential liability for Amounts Billed and plan accordingly.

If any interim calculation shows a deficit over any funds then held by BCBSM, the Group will be so advised and of its continuing obligation for payment. If any calculation shows a surplus over any funds then held by BCBSM, the amount of the surplus will be refunded to the Group by BCBSM within thirty (30) days. Any Amounts Billed will first be charged against any funds then held by BCBSM and, after exhausted, BCBSM will monthly invoice the Group for Amounts Billed.

BCBSM will continue to pay the Group STIGB on any positive balance as set forth in Subsection F. 2. above, and any monthly invoices will be subject to late payment charges if not paid within thirty (30) days.

5. <u>Final Calculation and Notification of EOL.</u> Within ninety (90) days after the twenty-four month period following termination, BCBSM will prepare a settlement, also in the form of a quarterly settlement, make a final calculation of the EOL and advise the Group of its continuing liability for payment. Any funds then held by BCBSM will be returned to the Group within thirty (30) days.

6. <u>Subsequent Claims.</u> Any claims received thereafter will be billed to the Group and payable within thirty (30) days of receipt.

G. **Conversion to Underwritten Group.**

The provisions of Sections F.1.through 6., inclusive shall also apply if the Group converts from a self-funded group to a BCBSM underwritten group. Any EOL so calculated shall remain the obligation of the Group, and shall be timely paid as set forth in such Sections in addition to any premium payments as a BCBSM underwritten group.

**ARTICLE V**

11

## GROUP ACKNOWLEDGMENT OF BCBSM
## SERVICE MARK LICENSEE STATUS

This Contract is between the Group and BCBSM, an independent corporation licensed by the Blue Cross and Blue Shield Association (BCBSA) to use the Blue Cross and Blue Shield names and service marks in Michigan. However, BCBSM is not an agent of BCBSA and, by entering into this Contract, the Group agrees that it made this Contract based solely only on its relationship with BCBSM or its agents. Group further agrees that BCBSA is not a party to, nor has any obligations under this Contract, and that no obligations of BCBSA are created or implied by this language.

## ARTICLE VI
## BLUECARD PROGRAM SERVICES
## PROCESSED AND PAID BY OTHER BCBS PLANS

Exhibit 1 attached to this Contract describes the BlueCard Program available through the BCBSA. If the BCBSA revises the disclosure in Exhibit 1, BCBSM will give the Group notice with a new Exhibit 1, which will automatically become part of this Contract sixty (60) days after notice has been given.

## ARTICLE VII
## AGREEMENT, TERM, TERMINATION, AMENDMENT, AND LAW

**A.　Entire Agreement.**

This Contract includes and incorporates any Schedules, Addenda, Exhibits, and Amendments and represents the entire understanding and agreement of the parties regarding matters contained herein, supersedes any prior agreements and understandings, oral or written, between the parties and shall be binding upon the parties, their successors or assigns.

**B.　Termination.**

1. <u>Normal.</u> Either party may with or without cause, upon the first (1st) day of the month following thirty (30) days written notice, terminate this Contract as to claims incurred after termination.

2. <u>Nonpayment/Partial Payment.</u> Notwithstanding any other Contract provisions, in the event that the Group fails to timely pay any amounts owed, BCBSM may, after five (5) days notice, terminate this Contract.

**C.　Amendment.**

This Contract may be amended at any time, but only by written agreement duly executed only by authorized representatives of the parties.

**D.　Severability.**

The invalidity or nonenforceability of any provision of the Contract shall not affect the validity or enforceability of any other provision of the Contract.

**E.    Waiver.**

The waiver by a party of any breach of this Contract by the other party shall not constitute a waiver as to any subsequent breach.

**F.    Law.**

This Contract is entered into in the State of Michigan and, unless preempted by federal law, will be construed according to the laws of Michigan.

**G.    HIPAA; Business Associate Requirements.**

HIPAA requires "covered entities" to have contracts with its "business associates." The Group signed the Contract on behalf of itself and on behalf of Group's "group health plan" for which Group is the "plan administrator," as defined by ERISA. Since the Group's group health plan is a covered entity, and BCBSM is its business associate, Exhibit 2 attached hereto is made a part of this Contract. The meanings of the terms "covered entities," "business associates," and "group health plan" are defined in HIPAA.

**H.    New York Surcharge.**

New York imposes two separate surcharges that impact the cost of health care in New York - the "graduate medical education" (GME) surcharge (also known as the "professional education pool" (PEP) surcharge) and the "uncompensated care surcharge." The GME surcharge is imposed to fund graduate medical education and only applies to inpatient, non-Medicare hospital services. The uncompensated care surcharge is for indigent care, and, subject to certain exceptions, it applies to services, including outpatient, emergency and ambulatory surgery services, received in the State of New York from designated health care providers -- hospitals, diagnostic treatment centers, and freestanding clinical laboratories, regardless of the state in which the person lives.

The amount of the GME surcharge varies among eight regions in New York with the lowest in the Utica region and the highest in the New York City region, but a group can elect to pay the surcharge directly to the State resulting in a flat fee per resident or per family again varying by region. The amount of the uncompensated care surcharge is an additional 32.85% of the provider's charge unless an election is made to pay the State directly, in which case the surcharge is reduced to 8.85%.

The New York Blue Cross Blue Shield (BCBS) Plans and the New York Health Department agreed to allow the NY BCBS Plans to file timely elections permitting them to pay the surcharges directly on behalf of all BCBS Plans nationwide for all of their lines of business, including HMOs, that use the BCBS service marks. This means that, if the Group agrees, Blue Cross and Blue Shield of Michigan (BCBSM) may, through the NY BCBS Plans, on the Group's behalf, pay both (i) the GME surcharge by reporting the number of Enrollees who are New York residents and submit it with the covered lives assessment directly to the Empire NY BCBS Plan which then submits that to the State and (ii) the uncompensated care surcharge at the 8.85% level for services provided to its Enrollees in New York that are submitted and processed through NASCO or the BlueCard program.

By signing this Schedule A, the Group is consenting to the foregoing actions on its behalf. In addition, it consents to do to the following, consistent with Sections 2807-j.5 to 2807-t.3 of New York's Public Health Law:

- submit when required by the law, the information regarding specific payment amounts to New York providers and enrollment in New York;
- certify the data submitted to the State and allow the New York State Commissioner of Health access to the data for verification purposes; and
- submit to the jurisdiction of the State of New York to maintain an action to enforce the provisions of the new law related to payment of the assessments.

NOTE: This consent only applies to claims paid through the New York Blue Cross Blue Shield Plans via NASCO or BlueCard. If the Group also has another health carrier, it should consult that carrier as to how an election can be made.

**BCBSM:**

By: *[signature]*
(signature)

Name: TINA FEDERIGHE
(print)

Title: Account Manager

Date: 3/29/05

By: _____
(signature)

Name: _____
(print)

Title: _____

Date: _____

**GROUP on behalf of itself and as Plan Sponsor of the Plan:**

By: *[signature]*
(signature)

Name: Andrew T. Washburn
(print)

Title: Treasurer

Date: March 24, 2005

By: _____
(signature)

Name: _____
(print)

Title: _____

Date: _____

14

Exhibit 1

**BlueCard**

Like all Blue Cross and Blue Shield Licensees, BCBSM participates in a program called "BlueCard." Whenever Enrollees access health care services outside the geographic area BCBSM serves, the claim for those services may be processed through BlueCard and presented to BCBSM for payment in conformity with network access rules of the BlueCard Policies then in effect ("Policies"). Under BlueCard, when Enrollees receive covered health care services within the geographic area served by an on-site Blue Cross and/or Blue Shield Licensee ("Host Plan"), BCBSM will remain responsible to the Group and its Enrollees for fulfilling BCBSM's contract obligations. However, the Host Plan will be responsible, in accordance with applicable BlueCard Policies, if any, for providing such services as contracting with its participating providers and handling all interaction with its participating providers. The financial terms of BlueCard are described generally below.

**Liability Calculation Method Per Claim**

The calculation of a Enrollee's liability on claims for covered health care services incurred outside the geographic area BCBSM serves and processed through BlueCard will be based on the lower of the provider's billed charges or the negotiated price BCBSM pays the Host Plan.

The calculation of the Group's liability on claims for covered health care services incurred outside the geographic area BCBSM serves and processed through BlueCard will be based on the negotiated price BCBSM pays the Host Plan.

The methods employed by a Host Plan to determine a negotiated price will vary among Host Plans based on the terms of each Host Plan's provider contracts. The negotiated price paid to a Host Plan by BCBSM on a claim for health care services processed through BlueCard may represent:

    (i) the actual price paid on the claim by the Host Plan to the health care provider ("Actual Price"), or

    (ii) an estimated price, determined by the Host Plan in accordance with BlueCard Policies, based on the Actual Price increased or reduced to reflect aggregate payments expected to result from settlements, withholds, any other contingent payment arrangements and non-claims transactions with all of the Host Plan's health care providers or one or more particular providers ("Estimated Price"), or

    (iii) an average price, determined by the Host Plan in accordance with BlueCard Policies, based on a billed charges discount representing the Host Plan's average savings expected after settlements, withholds, any other contingent payment arrangements and non-

claims transactions for all of its providers or for a specified group of providers ("Average Price"). An Average Price may result in greater variation to the Enrollee and the Group from the Actual Price than would an Estimated Price.

Host Plans using either the Estimated Price or Average Price will, in accordance with BlueCard Policies, prospectively increase or reduce the Estimated Price or Average Price to correct for over- or underestimation of past prices. However, the amount paid by the Enrollee and the Group is a final price and will not be affected by such prospective adjustment. In addition, the use of a liability calculation method of Estimated Price or Average Price may result in some portion of the amount paid by the Group being held in a variance account by the Host Plan, pending settlement with its participating providers. Because all amounts paid are final, the funds held in a variance account, if any, do not belong to the Group and are eventually exhausted by provider settlements and through prospective adjustment to the negotiated prices.

Statutes in a small number of states may require a Host Plan either (1) to use a basis for calculating a Enrollee's liability for covered health care services that does not reflect the entire savings realized, or expected to be realized, on a particular claim or (2) to add a surcharge. Should any state statutes mandate liability calculation methods that differ from the negotiated price methodology or require a surcharge, the Host Plan would then calculate a Enrollee's liability and the Group's liability for any covered health care services consistent with the applicable state statute in effect at the time the Enrollee received those services.

**Return of Overpayments**

Under BlueCard, recoveries from a Host Plan or from participating providers of a Host Plan can arise in several ways, including but not limited to, anti-fraud and abuse audits, provider/hospital audits, credit balance audits, utilization review refunds, and unsolicited refunds. In some cases, the Host Plan will engage third parties to assist in discovery or collection of recovery amounts. The fees of such a third party are netted against the recovery. Recovery amounts, net of fees, if any, will be applied in accordance with applicable BlueCard Policies, which generally require correction on a claim-by-claim or prospective basis. Unless otherwise agreed to by the Host Plan, BCBSM may request adjustments from the Host Plan for full provider refunds due to the retroactive cancellation of membership only for one year after the Inter-Licensee financial settlement process date of the original claim. In some cases, recovery of claim payments associated with a retroactive cancellation may not be possible if the recovery conflicts with the Host Plan's state law or provider contracts or jeopardizes its relationship with its providers.

**BlueCard Fees and Compensation**

The Group understands and agrees (1) to pay certain fees and compensation to BCBSM which it is obligated under BlueCard to pay to the Host Plan, to the Blue Cross and Blue Shield Association, or to the BlueCard vendors, unless BCBSM's contract obligations to the Group require those fees and compensation to be paid only by BCBSM and (2) that fees and compensation under BlueCard may be revised from time to time without the Group's prior approval in accordance with the standard procedures for revising fees and compensation under BlueCard. Some of these fees and compensation are charged each time a claim is processed through BlueCard and include, but are not limited to, access fees, administrative expense allowance fees, Central Financial Agency Fees, and ITS Transaction Fees. Also, some of these claim-based fees, such as the access fee and the administrative expense allowance fee, may be passed on to the Group as an additional claim liability. Other fees include, but are not

limited to, an 800 number fee and a fee for providing PPO provider directories. If the Group does not have a complete listing, or wants an updated listing, of these types of fees or the amount of these fees paid directly by the Group, it should contact BCBSM.

MNLYWIRE.DOC
Revised 12/16/03

SCHEDULE A - Initial term (Rollover)
Administrative Services Contract - Local Monthly Wire
Between
Blue Cross and Blue Shield of Michigan
And
Challenge ~~Manufacturing~~ Mfg. Company

1. Contract Effective Date:     1/1/2005

2. Renewal Term Date:     1/1/2005-12/31/2005

3. Line(s) of Business

   | | | | |
   |---|---|---|---|
   | x | Blue Cross | x | Prescription Drugs |
   | | ____ Domestic* | x | Dental |
   | | ____ Foreign | | Vision |
   | x | Blue Shield | | Hearing |
   | x | Master Medical | | Other |

   *Domestic Facility Code (s) _____ (Hospital Groups Only)

4. Initial Prospective Hospital Reimbursement Estimate     $ 72,024.00
   (will be adjusted in the settlement)

5. Benefit Administrative Charge     Fee     Employees (Estimate)

   | | | | |
   |---|---|---|---|
   | a. | Monthly Fee/Estimated Employee Count | $ 35.08 | 481 |
   | b. | Predetermination - Foot Surgery | | |
   | c. | Mandatory Second Opinion | | |
   | d. | Case Management | | |
   | e. | Agent Administration | | |
   | f. | Total Monthly Charge | ####### | |
   | | (Based on Estimated Contracts) | | |

6. Excess Loss Coverage (s):

   a. Coverage (s) Effective
       ____ Specific Only     x    Specific and Aggregate
       ____ Aggregate Only     ____ None

   | | | Fee | Employees | Monthly Premium | Attachment Point |
   |---|---|---|---|---|---|
   | b. | Aggregate Coverage (120%) | $ 4.38 | 481 | $ 2,107 | $ 3,547 |
   | c. | Specific Coverage | $ 28.30 | 481 | $ 13,612 | $ 50,000 |
   | d. | Total | $ 32.68 | | $ 15,719 | |

   e. Covered Lines of Business

   | | | | |
   |---|---|---|---|
   | x | Blue Cross | x | Blue Shield |
   | | Domestic Charges | x | Master Medical |
   | | Foreign Payments | | Other |

7. Late Payment Charges/Interest

    a. Monthly Late Payment Charge                   2%
    b. Yearly Cumulative Statutory Interest Charge    12% Simple Interest
    c. Provider Contractual Interest

8. Payments

| Date | Claims, Stoploss, Admin. Fees | Hospital Advance | Estimated Rollover Credit/debit | Amount Due |
|---|---|---|---|---|
| 1/3/2005 | $171,701 | $ 36,012 | $ (32,583) | $ 175,130 ✓ |
| 2/1/2005 | $171,701 | $ 36,012 | $ (32,583) | $ 175,130 ✓ |
| 3/1/2005 | $188,574 | $ - | $ (32,583) | $ 155,991 ✓ |
| 4/1/2005 | $188,574 | $ - | $ (32,583) | $ 155,991 ✓ |
| 5/2/2005 | $188,574 | $ - | $ (32,583) | $ 155,991 ✓ |
| 6/1/2005 | $188,574 | $ - | $ (32,583) | $ 155,991 |

9. BCBSM Account:     1840-09397-3     Comerica-Detroit     0720-00096
                               Wire Number        Bank                  American Bank Assoc.

10. Effective with this contract, your hospital claims cost will reflect certain charges for provider network access, contingency, and other subsidies as appropriate.

BCBSM:  
By: _____  
Name: _____  
         (Signature)  
Title: _____  
         (Print)  
Date: _____  

By: *TINA FEDERIGHE*  
Name: *(signature)*  
         (Signature)  
Title: *Account Manager*  
         (Print)  
Date: 12/22/04  

THE GROUP:  
By: *A. T. W.*  
Name: *Andrew T. Washburn*  
         (Signature)  
Title: *Treasurer*  
         (Print)  
Date: *December 22, 2004*  

By: _____  
Name: _____  
         (Signature)  
Title: _____  
         (Print)  
Date: _____